Case No. 12-36049

_____

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

UNITED BROTHERHOOD OF CARPENTERS AND
JOINERS OF AMERICA, ET AL.,

Plaintiffs – Appellants,

v.

BUILDING AND CONSTRUCTION TRADES DEPARTMENT,
AFL-CIO, ET AL.,

Defendants – Appellees.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON
HONORABLE THOMAS O. RICE, J.
CASE No. 2:12-CV-00109
_____

**DEFENDANTS – APPELLEES' ANSWERING BRIEF**

_____

LEON DAYAN
ABIGAIL V. CARTER
JOSHUA B. SHIFFRIN
MATTHEW STARK RUBIN
LAURENCE GOLD
BREDHOFF & KAISER, PLLC
805 Fifteenth St. N.W.,
    Tenth Floor
Washington, D.C.   20005
Telephone:   (202) 842-2600

*Attorneys for Defendants–Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITES ......................................................................iv

COUNTERSTATEMENT OF THE CASE................................................1

    A.    Nature of the Case and Disposition Below.............................................1

    B.    Counterstatement of the Facts.................................................2

        1.    The Facts Alleged in the Complaint.......................................... 3

            a.    The "Push-Back-Carpenters Campaign" and the Defendants' Role in that Campaign ....................................3

            b.    Alleged Third-Party Acts of Violence, Vandalism and Threats ...........................................................6

            c.    The Material Mischaracterizations of the Complaint ........8

                (i)    Mischaracterizations of Defendants' Connection to the Alleged Acts of Violence ............8

                (ii)    Mischaracterizations of the Push-Back-Carpenters Campaign as Including a "Host" of "Tortious" Acts Short of Violence Committed by Defendants ........10

COUNTERSTATEMENT OF THE ISSUES …………………………......... 14

SUMMARY OF ARGUMENT ...........................................................14

ARGUMENT…………………………....………………………........18

I.    THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' RICO CLAIMS FOR FAILURE TO MAKE OUT THE BASIC "RACKETEERING" ELEMENT .................................................19

A.     As the District Court Held, the Complaint Fails to Make
       out the Elements of Hobbs Act "Attempted Extortion"......................19

       1.     The Complaint Fails to Make out a Hobbs Act
              Violation Based on the "Wrongful" Use of
              Economic Pressure....................................................................20

              a.  An Unbroken Line of Hobbs Act Appellate Decisions
                  Establishes that Where a Defendant Uses Economic Pressure
                  to Obtain a Lawful and Legitimate Agreement, that Use Is
                  Not the "Wrongful Use of Fear" ........................................ 20

              b.  The Agreement Sought by the Defendants Here is
                  Lawful and Legitimate.........................................................25

              c.  Plaintiffs' Efforts to Find Defendants' Use of Economic
                  Pressure "Wrongful," Notwithstanding the Legitimacy of
                  Plaintiffs' Objective, are Unavailing...................................26

       2.     The Complaint Fails to Make Out a Hobbs Act "Attempted
              Extortion" Violation Based on the Alleged "Use of
              Force or Violence"...................................................................32

              a.  Plaintiffs' Claim that the Complaint Alleges that
                  Defendants "Personally" Made Threats of
                  Violence is a Spurious One, Resting on a Serious
                  Mischaracterization of the Complaint and a Serious
                  Misunderstanding of the First Amendment.....................32

              b.  The Complaint's Conclusory Conspiracy and
                  Agency Allegations are Insufficient under
                  Established Pleading Principles to Hold
                  Defendants Responsible for the Violent Acts
                  of Third Parties ..................................................................35

              c.  The District Court's Alternative Ground for
                  Rejecting the Plaintiffs' Extortion-Through-Force
                  Theory – that None of the Alleged Violent Acts Caused a
                  Cognizable RICO Injury – Also Provides a Sound Basis on
                  Which to Reject that Theory................................................41

ii

     C.     The District Court Correctly Rejected Plaintiffs' Attempt to
Ground Its RICO Claims on State Extortion Statutes.........................42

II.    THE COMPLAINT ALSO FAILS TO MAKE OUT THE SEPARATE
"PATTERN" ELEMENT OF A RICO CLAIM ............................................45

III.   RICO COUNTS I AND II ARE DEFECTIVE FOR FAILURE
TO PLEAD THE REQUISITE "INVESTMENT" AND
"ACQUISITION" ELEMENTS ....................................................................48

IV.   THE COMPLAINT FAILS TO STATE AN LMRDA CLAIM...................52

V.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
DENYING LEAVE TO AMEND…………………....……………………56

CONCLUSION .........................................................................................................58

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................36

*Batzel v. Smith*, 333 F.3d 1018 (9th Cir. 2003) ......................................39

*BE&K Const. v. United Bhd. of Carpenters*, 90 F.3d 1318 (8th Cir. 1998)............38

*Beck v. Prupis*, 529 U.S. 494 (2000).........................................................51

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ......................................36

*Breininger v. Sheet Metal Workers*, 493 U.S. 67 (1989).........................................55

*Brokerage Concepts v. U.S. Healthcare*,
   140 F.3d 494 (3d Cir. 1998) ........................................................ *passim*

*Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083 (9th Cir. 2002) ...........................18

*Cintas v. Unite Here*, 601 F. Supp. 2d 571 (S.D.N.Y.), *aff'd* 355 F. App'x 508
   (2d Cir. 2009)................................................................. 25, 26, 27, 31, 44

*Cleveland v. United States*, 531 U.S. 12 (2000) ......................................31

*Dtex, LLC v. BBVA Bancomer*, 405 F. Supp. 2d 639 D.S.C. 2005), *aff'd*, 214 F.
   App'x 286 (4th Cir. 2007) ................................................... 46, 48

*George Lussier Enters. v. Subaru of New England*, 393 F.3d 36
   (1st Cir. 2004) ................................................................. 24, 29

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989) .....................46

*Kendall v. Visa USA*, 518 F.3d 1042 (9th Cir. 2008) .............................................37

*Laughon v. Int'l Alliance of Theatrical Stage Employees*,
   248 F.3d 931 (9th Cir. 2001) ................................................................38

iv

*Letter Carriers v. Austin*, 418 U.S. 264 (1974) ......................................11

*Linens of Europe, Inc. v. Best Manufacturing, Inc.*,
  2004 WL 2071689 (S.D.N.Y. Sept. 16, 2004) ............................................. 47, 48

*NLRB v. Lloyd A. Fry Roofing Co.*, 193 F.2d 324 (9th Cir. 1951) ..........................39

*NAACP v. Claiborne Hardware*, 458 U.S. 886 (1982) .................................... 10, 34

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ...................................................11

*Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007).........................................49

*Rennell v. Rowe*, 635 F.3d 1008 (7th Cir. 2011) ............................................. 25, 31

*Salinas v. United States*, 522 U.S. 52 (1997)...........................................................51

*Scheidler v. NOW*, 537 U.S. 393 (2003).................................................... 42, 43, 44

*Seattle Times v. Seattle Mailer's Union No. 32*, 664 F.2d 1366 (9th Cir. 1982).....40

*Smithfield Foods, Inc. v. UFCW*, 585 F. Supp. 2d 789 (E.D. Va. 2008)................44

*Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293 (9th Cir. 1998)............................46

*United Association  v. Local 334*, 452 U.S. 615 (1981) .........................................54

*United Bhd. of Carpenters, Local 42-L v. United Bhd. of Carpenters*,
  73 F.3d 958 (9th Cir. 1996) ...............................................................................54

*United Brotherhood of Carpenters v. United States*, 330 U.S. 395 (1947)............41

*United States v. Brooklier*, 685 F.2d 1208 (9th Cir. 1982).....................................48

*United States v. Clemente*, 640 F.2d 1069 (2d Cir. 1981) .................... 21, 22, 23, 30

*United States v. Daane*, 475 F.3d 1114 (9th Cir. 2007) .........................................20

*United States v. Enmons*, 410 U.S. 396 (1973).............................. 22, 23, 24, 25, 30

v

*United States v. Greger*, 716 F.2d 1275 (9th Cir. 1983) ........................................28

*United States v. Kemble,* 189 F.2d 889 (3d Cir. 1952) ............................................41

*United States v. Nardello*, 393 U.S. 286 (1969) ....................................................43

*United States v. Thordarson*, 646 F.2d 1323 (9th Cir. 1981) ................................20

*United States v. Velasquez-Bosque,* 601 F.3d 944 (9th Cir. 2010) .................. 43, 44

*United States v. Vigil*, 523 F.3d 1258 (10th Cir. 2008) ..........................................28

*Van Buskirk v. CNN,* 284 F.3d 977 (9th Cir. 2002) ...................................................3

*Viacom Int'l v. Icahn,* 747 F. Supp. 205 (S.D.N.Y. 1990),
    *aff'd,* 946 F.2d 998 (2d Cir. 1991) ....................................................................29

*Wagh v. Metris Direct, Inc.*, 363 F.3d 821 (9th Cir. 2003),
    *overruled on separate issue* ........................................................... 17, 49

*Wilkie v. Robbins*, 551 U.S. 537 (2007)................................................... 43, 44, 45

*Wooddell v. Elec. Workers*, 502 U.S. 93 (1991)......................................................54

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,*
    883 F.2d 132 (D.C. Cir. 1989) ...........................................................................40

## STATUTES AND RULES

18 U.S.C. § 1951(b)(2)................................................................................19

18 U.S.C. § 1961 (1)(A)......................................................................... 18, 43

18 U.S.C. § 1961(1)(B).............................................................................18

18 U.S.C. § 1961(5) ..................................................................................46

18 U.S.C. § 1962(a) ............................................................................ 48, 50, 52

18 U.S.C. § 1962(b) ................................................................ 48, 50, 52

18 U.S.C. § 1962(d) ............................................................... 48, 50, 51

18 U.S.C. § 1964(c) .......................................................... 41, 49, 50, 51, 52

29 U.S.C. § 106 ..................................................................................41

29 U.S.C. § 185 ..................................................................................54

29 U.S.C. § 411(a)(5) ...........................................................................53

29 U.S.C. § 501(c) ..............................................................................12

Fed. R. Civ. P. 12(b)(6) .................................................................... 2, 45

## COUNTERSTATEMENT OF THE CASE

**A.      Nature of the Case and Disposition Below**

This is an action brought under the Racketeering Influenced and Corrupt Organizations Act ("RICO"). The lead plaintiff is the United Brotherhood of Carpenters ("UBC"); the lead defendant is the Building and Construction Trades Department of the AFL-CIO ("BCTD"). The BCTD is a federation of national construction trade unions; the UBC is a national construction trade union that disaffiliated from the BCTD and the AFL-CIO. The UBC's Complaint attacks, as a RICO violation, a BCTD multi-faceted economic pressure campaign against the UBC instituted in response to what the BCTD perceived as the UBC's organizing incursions into the traditional work jurisdiction of the construction trade unions affiliated with the BCTD. The alleged aim of the campaign is to induce the UBC to rejoin the BCTD.

In addition to naming the BCTD as a defendant, the Complaint names three individuals: James Williams, then-President of the International Union of Painters and Allied Trades ("Painters"), who sat on the executive board of the BCTD; Ron Ault, the President of the Metal Trades Department of the AFL-CIO ("Metal Trades"); and David Molnaa, the President of the Hanford Metal Trades Council. The Complaint refers to the BCTD and Williams collectively as the "BCTD Defendants," ER 57, and we adopt that nomenclature.

1

While the Complaint's primary focus is on the alleged RICO violations, which are pleaded in the first four counts, the Complaint also includes a fifth federal count, brought under the Labor-Management Reporting and Disclosure Act ("LMRDA"), and four supplemental state-law counts.

The District Court dismissed all of the federal counts pursuant to Fed. R. Civ. P. 12(b)(6), holding, in short: (1) that, insofar as Plaintiffs were complaining about the BCTD's multi-faceted economic pressure campaign, Plaintiffs had failed to plead any actionable RICO or LMRDA wrongs; and (2) that, insofar as Plaintiffs were complaining about acts of sporadic violence and vandalism alleged to be connected to that campaign, their allegations were insufficient under the applicable pleading standards to impute responsibility for those acts to any of the Defendants and insufficient as well to show that the alleged violent conduct caused any of the Plaintiffs' complained-of injuries. ER 1-45. The District Court declined to exercise supplemental jurisdiction over the state-law claims and hence dismissed the entire action.

## B.    Counterstatement of the Facts

This Counterstatement of the Facts both provides a more comprehensive description of the Complaint than Plaintiffs provide in their appellate brief ("Brief" or "AOB"), and corrects as well several serious misrepresentations in that brief as to what their Complaint states with regard to the alleged wrongful conduct by, or

attributed to, the Defendants. Our Counterstatement is drawn exclusively from the Complaint and the attachments thereto. *See Van Buskirk v. CNN*, 284 F.3d 977, 980 (9th Cir. 2002).

### 1.    The Facts Alleged in the Complaint

#### a.    The "Push-Back-Carpenters Campaign" and the Defendants' Role in that Campaign

The Complaint alleges that the UBC, after disaffiliating from the AFL-CIO and the BCTD, began "in October 2008" to implement a program of "recruiting, accepting and training dues-paying members who perform electrical work." ER 127. Electrical work, as the Complaint alleges, is work that the BCTD considers to be within the proper jurisdiction of the International Brotherhood of Electrical Workers ("IBEW"), a BCTD affiliate. ER 123.

The Complaint further alleges that, in response to that perceived organizing incursion by the UBC into the IBEW's craft jurisdiction, the BCTD Defendants decided to institute an economic pressure campaign, referred to as the "Push-Back-Carpenters Campaign," intended to induce the UBC to re-affiliate with the BCTD. ER 127-28, 139. Re-affiliation, the Complaint alleges, would require the UBC to resume paying the monthly per capita fees prescribed in the BCTD's Constitution for all of its affiliates, and to resume complying with the jurisdictional and other BCTD rules that regulate affiliates to protect them from, *inter alia*, incursions by one another. ER 61-62, 71, 120-21, 200.

3

Because "[t]he BCTD Defendants believed that in order [for the campaign] to succeed, they needed the full backing of the entire AFL-CIO," the BCTD Defendants "orchestrated passage of Resolution 70 at the September 2009 AFL-CIO Convention." ER 67, 127-28. "Resolution 70 urges the Carpenters to re-affiliate with the AFL-CIO and the Building and Construction Trades Department," and further provides that, "[s]hould the Carpenters refuse," the AFL-CIO would begin to "organiz[e]" and "charter" unions that would compete with the UBC to represent workers in the carpentry crafts traditionally represented by the UBC. ER 67, 128.

Next—and "on the heels of passage of Resolution 70"—the Complaint alleges that the BCTD "publically announced" its Push-Back-Carpenters Campaign by conducting a "massive rally" in St. Louis in June 2010, called the "Unity Rally," which was designed by the BCTD "to show the Carpenters that the BCTD Defendants were capable of doing more than just passage of a Resolution; to show the Carpenters that they were able to organize massive numbers of BCTD union members ... in a united, decisive and immediate stand against the Carpenters to pressure" them to rejoin the BCTD. ER 138-40.

The Complaint alleges that, at the Unity Rally, Defendants employed harsh rhetoric to motivate the crowd. Defendant Williams, for example, is alleged to have told the audience that there was "no going back" after the rally, which

represented a "line in the sand." ER 141-42. Mark Ayers, then President of the BCTD, allegedly told those present that they were "being threatened all around the nation" by the UBC, and that this "needs to end in St. Louis." ER 141.

Following the Unity Rally, Defendants "set up a formal Committee" to implement the Push-Back-Carpenters Campaign. ER 71-72. "One of the first things the Committee" did "was establish the Respectourcrafts.com website," ER 72-73, which repeatedly criticized the UBC and its practices. ER 180-86.

The Complaint alleges that despite all this, "by November 2010, none of the BCTD Defendants'" campaign actions "had been particularly effective at forcing the Carpenters to give in" to the BCTD's alleged "demand[]" that the UBC re-join the BCTD. ER 73. So, the Complaint continues, the BCTD Defendants pivoted to a new strategy: persuading the Metal Trades Department of the AFL-CIO—a federation of national metal trade unions and a sister organization to the BCTD, but one in which the UBC was participating pursuant to a Metal Trades-UBC "Solidarity Agreement"—to "kick out" the UBC by terminating the Solidarity Agreement. ER 73-74. That strategy was consummated, the Complaint alleges, in the summer of 2011, when the Metal Trades informed the UBC that it was terminating the Solidarity Agreement. ER 77.

The Complaint then concludes its description of the core components of the Push-Back-Carpenters Campaign with the allegation that "[t]he BCTD

Defendants' most recent escalation of its Push-Back-Carpenters Campaign and its unlawful extortionate conspiracy is their implementation of [AFL-CIO] Resolution 70," ER 186, which began "in October 2011" when the BCTD Defendants started to "charter[] and financially support[] various carpenter dissident groups." ER 77-78.

### b.    Alleged Third-Party Acts of Violence, Vandalism and Threats

While the central focus of the Complaint is on the use of the foregoing non-violent economic pressure tactics, the Complaint also includes allegations that, on a handful of occasions over a 30-month period, acts of vandalism, violence and threats of violence aimed at individuals associated with the UBC were perpetrated by various non-Defendants, many unnamed.

As to the alleged acts of vandalism, the Complaint fails to identify *any* person as the perpetrator. *See, e.g.,* ER 134, 211, 212, 214-15. For example, in describing incidents in St. Louis in August 2009 and April 2010, the Complaint alleges that unnamed individuals vandalized work trucks, spray-painted anti-Carpenter logos on two work buildings, vandalized a construction site, and smashed a $20,000 sign. ER 134, 214. The Complaint seeks to tie the acts of these individuals to Defendants by labeling the individuals, in conclusory boilerplate, as "BCTD Defendants' agents." ER 64, 68, 78-79, 134, 221-22.

With respect to the allegations of threatened violence, the Complaint does name four individuals who allegedly committed improper acts, but its description of the individuals makes it clear that the alleged perpetrators were employed by other entities and not by any Defendant. *See* ER 136 (identifying Tim Schoemehl, "a Business Agent for IBEW Local #1 in St. Louis," and his brother Stephen, an "IBEW" representative as the authors of e-mails that told the representative of a UBC affiliate, "The walls are closing in on you"); ER 214 (alleging that "Eric Gustafson of the Ironworkers Local #86" "rushed," but did not touch, Carpenters' representatives); ER 213 (alleging that "a Laborers' representative, believed to be Doug Strand, got in [a UBC representative's] face"). In each case, Plaintiffs attempt to make up for the fact that these individuals are not employed by any Defendant by labeling them—in conclusory boilerplate—as "BCTD Defendants' agents." ER 136, 214.

In their Brief, Plaintiffs also characterize as a threat of violence a portion of a speech made at the Unity Rally by non-Defendant Terrence O'Sullivan, President of the Laborers International Union. The Complaint alleges that, in his speech, O'Sullivan told the audience that in his old neighborhood, they would "hang" people like the UBC's President and asked the audience if anyone had any "rope." ER 143-44. Notably, given the First Amendment principles set forth *infra*, the Complaint does not allege that any violent acts occurred at, or on the heels of, the

Unity Rally. To the contrary, the first such act alleged after the rally occurred some 16 months later in Seattle, where unnamed individuals allegedly vandalized a UBC worksite and cocked a fist at a UBC member. ER 211-12.

### c. The Material Mischaracterizations of the Complaint

Plaintiffs' Brief seriously misrepresents what their own Complaint alleges with regard to the isolated acts of vandalism, violence and other wrongful acts that the Complaint describes.

### (i) Mischaracterizations of Defendants' Connection to the Alleged Acts of Violence

Most strikingly, Plaintiffs' Brief, in four separate places, portrays the Complaint and its attachments as alleging that Defendants "have *praised* past acts of violence against the Carpenters" by "*publicly disseminating* a YouTube video of ironworkers beating and kicking helpless Carpenters," AOB 10, "*accompanied by a written warning that similar violence would ensue* if the Carpenters did not comply with the Defendants' demands," AOB 29 (emphasis added). *See also* AOB 2, 36. Plaintiffs' difficulty is that the Complaint and its attachments do not allege any of these italicized "facts."

What the Complaint and attachments do allege is that the BCTD Defendants referred to a YouTube video in an article posted on a BCTD website and cited the video as depicting an incident of violence initiated *by a UBC representative against a member of a BCTD affiliate* (the Ironworkers). *See* ER 302. More

8

specifically, what the Complaint alleges is that the BCTD posted a news article (attached as Exhibit C to the Complaint) reporting on the broad jurisdictional dispute between the UBC and the BCTD and, in the course of so doing, referring in one of its paragraphs to a "video that surfaced" on YouTube of a "confrontation between two Carpenter Business Agents and a group of Iron Workers" that started "*after one of the Carpenter Business Agents grabs an Iron Worker* as he tries to enter a job site" and that "ends in a brawl." ER 302 (emphasis added). In the same paragraph, the website article says that the "[c]raft unions are not taking this struggle lying down." The website article in no way "disseminates" the video in question as Plaintiffs' Brief asserts; in fact, the article does not provide a link or even an internet address to the video. Nor does the article include anything that remotely could be taken as a "written warning" that "violence would ensue if the Carpenters did not comply with the Defendants' demands."

The Plaintiffs' repeated portrayal in their Brief of the allegations concerning the YouTube video is thus a complete fiction.

Plaintiffs' Brief also portrays the record below as including the allegation that "*a Building Trades official* in Spokane threatened a Carpenters representative that *the Building Trades* 'will start killing Carpenters … soon.'" AOB 2 (emphases added; quotation marks and ellipses in original). This too is a misstatement of the record. In fact, the alleged threat (which is set out in Plaintiffs' RICO Case

Statement, not in the Complaint itself) is *not* alleged to have included any assertion that "the Building Trades" would be killing anyone.  Further, it is *not* alleged to have been made by "a Building Trades official," but, rather, by a non-defendant employee of a non-defendant local union affiliate of the non-defendant Boilermakers Union. *See* ER 335.

> ### (ii)    Mischaracterizations of the Push-Back-Carpenters Campaign as Including a "Host" of "Tortious" Acts Short of Violence Committed by Defendants

Plaintiffs' Brief also misstates the record by asserting that the Complaint alleges "a host of wrongful pressure tactics short of violence"—also described as "tortious acts of harassment and coercion"—committed by Defendants. AOB 1, 25. Indeed, the Brief seeks to create the impression that the Complaint alleges that the Push-Back-Carpenters Campaign was essentially a vehicle through which Defendants were committing a series of torts. AOB 25-27. That impression is false.

Plaintiffs' Brief enumerates five categories of allegedly "tortious" acts attributable to Defendants. AOB 25-27. One of these categories consists of "public vilification of the Carpenters in speeches, newsletters, and on the internet." AOB 2. But such "public vilification" is not a tortious act and is indeed protected by the First Amendment. *NAACP v. Claiborne Hardware*, 458 U.S. 886, 921 (1982).[1]

---

[1] A statement "vilif[ying]"another  can constitute an actionable tort in the labor context only if it is defamatory, false, and uttered "'with knowledge that it was

As a second supposed instance of a "tortious act[]," Plaintiffs refer to allegations in their Complaint concerning Richard Robblee, a Seattle lawyer whose firm had been representing *both* a local UBC affiliate *and* at least two local BCTD affiliates in 2009, when the UBC's and BCTD's interests had begun to diverge sharply. ER 219. The Complaint alleges that Robblee's BCTD clients stated to Robblee in 2009 that they would "fire his firm" if the firm did not immediately cease representing the UBC affiliate on all matters. ER 218. Given that a client has the absolute legal right to discharge its lawyer at will, *see* Wash. R. Prof. Cond. 1.16 & comm. 4, the proposition that a client commits a "tort[]" by informing the lawyer that it intends to exercise this right of discharge if the lawyer continues to represent the client's archrival is self-refuting.

As a third supposed instance of a "tortious act," Plaintiffs' Brief invokes the "expulsion of the Carpenters from the Metal Trades"—that is, the termination by the Metal Trades Department of the UBC's Solidarity Agreement with that Department—and asserts that this was a "a breach of … fiduciary duties" by Defendants Ault and Williams to the Metal Trades. AOB 26. But Plaintiffs omit to

---

false or with reckless disregard of whether it was false or not.'" *Letter Carriers v. Austin,* 418 U.S. 264, 281 (1974) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964)). The Plaintiffs do not assert in their Brief that any alleged statement of "public vilification" identified in the Complaint met that test. The most that Plaintiffs' Brief says, on one occasion, is that some of the "vilification" was "false and misleading," AOB 26, but even then Plaintiffs do not contend that it was knowingly or recklessly so.

mention that the District Court rejected that contention in a ruling that Plaintiffs have not appealed or argued was erroneous. *See* ER 37-39. The District Court did so in response to Plaintiffs' theory presented below—and abandoned on appeal— that the termination of the Solidarity Agreement constituted criminal embezzlement and breach of fiduciary duty by Ault and Williams in violation of 29 U.S.C. §501(c).[2]

As their fourth category of "tortious acts of harassment," Plaintiffs point to certain acts that—like the sporadic acts of alleged vandalism and violence discussed *supra*—the Complaint alleges were committed by non-Defendant third parties but does not connect to Defendants except through boilerplate legal conclusions of agency.

In particular, Plaintiffs reference the allegations claiming that "frivolous regulatory complaints" were filed against the UBC in Washington, AOB 12, but omit to mention that the Complaint names only non-Defendant local union affiliates of the non-Defendant Laborers, Painters, and Plasterers national unions as the sponsors of those filings. *See, e.g.,* ER 157 (alleging that "the Laborers,

---

[2] In this regard, the District Court took note of the Complaint's allegations that Ault, the President of the Metal Trades, had given full disclosure to the Metal Trades Department's Executive Council, its highest governing body, as to the advantages and disadvantages of terminating the Agreement, and held that those allegations foreclosed any claim of breach of duty to the Metal Trades Department because they showed that "the actions taken were with the full knowledge of the MTD Executive Council." ER 39.

through their agent, Abbott, fil[ed] numerous [frivolous] complaints"); ER 105 (identifying Abbott as "an officer of the Laborers District Council" and adding boilerplate that Abbott "agreed to act, and was acting, on behalf of the Defendants"); ER 158.

That leaves the fifth act, a 2011 incident in which a newly-chartered local union affiliated with the BCTD-affiliated Painters' Union that was seeking to organize dissident UBC members in New York allegedly received, and made use of, confidential UBC membership information. ER 190-93. The information was allegedly provided by Joanne Lein, an employee of a UBC affiliate who was sympathetic to dissident UBC members and who allegedly downloaded the information without her employer's authorization. *Id.* The Complaint alleges that "Defendant Williams and his [unnamed] agents" recruited Lein, ER 190, and while the Complaint is murky as to whether Williams knew the membership information being provided was confidential, even giving Plaintiffs the benefit of every doubt on that score, what the Complaint alleges, at most, is a single, isolated incident of wrongful conduct attributable to a Defendant in the course of a five-year campaign, and *not* a "host of wrongful acts," as Plaintiffs would have it.

## COUNTERSTATEMENT OF THE ISSUES

1.     Whether Plaintiffs' RICO claims were properly dismissed by the District Court for failure to meet the basic "racketeering" element of a RICO claim.

2.     Whether Plaintiffs' RICO claims also are subject to dismissal for failure to meet the "pattern" element of a RICO claim.

3.     Whether Plaintiffs' first two RICO claims (Counts I and II) were properly dismissed by the District Court on the alternative ground of failure to plead the requisite investment and acquisition elements applicable to the particular RICO provisions under which those claims were brought.

4.     Whether Plaintiffs' LMRDA claim was properly dismissed by the District Court.

5.     Whether the District Court abused its discretion when it denied Plaintiffs leave to amend.

## SUMMARY OF ARGUMENT

I.     The District Court correctly dismissed all four RICO claims for failure to meet the most basic element of a RICO claim—that the defendant committed a RICO predicate act of racketeering.

A.     The District Court correctly held that Plaintiffs had failed to make out the elements of attempted extortion under the Hobbs Act (a RICO

14

predicate offense) through either of the two Hobbs Act theories the Plaintiffs proffered. The court properly rejected Plaintiffs' first theory—that the BCTD Defendants' non-violent "use of economic fear," as exerted through the Push-Back-Carpenters Campaign, was a "wrongful use" of such fear under the Hobbs Act—by faithfully following an unbroken line of appellate decisions.

That line of decisions establishes that where a defendant uses economic pressure to induce the plaintiff to enter into a proposed transaction, that use is not a "wrongful use" if the proposed transaction is lawful and legitimate. Because the objective of the campaign here is to induce the UBC to rejoin the BCTD under the terms applicable to all BCTD affiliates, and because that objective is perfectly lawful and legitimate, Plaintiffs' "use of economic fear" theory fails.

Plaintiffs' contention that, because they do not "want" the re-affiliation sought by Defendants, the proposed transaction is "illegitimate," is foreclosed by that same line of appellate decisions. A common ingredient in every case in that line is that the party on the other side of the transaction from the defendant did not "want" to enter into it and would not have considered doing so absent the economic pressure exerted by the defendant.

Equally unavailing is Plaintiffs' contention that, even if the objective of the Push-Back-Carpenters Campaign is legitimate, the campaign should be characterized as a campaign to commit "a host" of "tortious acts" "short of

15

violence," and that Defendants' pursuit of such a campaign constitutes "the wrongful use of economic fear" under the Hobbs Act. That contention fails both factually and legally—factually, because the key acts that Plaintiffs brand as "tortious" either are not tortious at all (such as "vilification" of the UBC), or are not properly attributable to any Defendant; and legally, because in use-of-economic-fear cases, the relevant question is whether the objective sought is lawful, and not whether one or more of the pressure tactics constituted a tort or breach of contract.  State civil law, not the Hobbs Act, polices non-violent tortious conduct and contract breaches in circumstances where the defendant's objective in pursuing an economic pressure campaign is lawful and legitimate.

The District Court properly rejected Plaintiffs' second Hobbs Act theory—their attempted-extortion-through-use-of-force theory—for the simple reason that the Complaint, when analyzed under the now familiar *Twombly-Iqbal* pleading standard, does not tie any of the sporadic acts of violence described in the Complaint to the Defendants. The Complaint's formulaic conclusory assertions that the third parties who are alleged to have committed the violent acts were "Defendants' co-conspirators" or "Defendants' agents" are insufficient to hold Defendants responsible for those acts.

B.  The District Court properly rejected Plaintiffs' attempted extortion "chargeable under State law" theory by relying on clear Supreme Court precedent

16

holding that a plaintiff invoking such a theory must satisfy all the elements of "generic extortion"—elements that mirror those set out in the Hobbs Act's definition of extortion.

II.     The Plaintiffs' RICO counts also fail because the Complaint does not adequately allege the "pattern" of racketeering activity required to make out a RICO claim. Where, as here, a defendant attempts in multiple ways to achieve a single extortionate objective, the defendant is chargeable with a single act of attempted extortion, not multiple acts. And a "pattern" requires at least two predicate acts of racketeering.

III.     RICO Counts I and II are also deficient for failure to allege the requisite "investment" and "acquisition" elements applicable to the particular RICO provisions invoked in those counts. This Court's decision in *Wagh v. Metris Direct, Inc.* is directly controlling on this point.

IV.     The LMRDA count was properly dismissed, albeit for the wrong reason. The proper basis for dismissal is that LMRDA §101(a)(5) is applicable only to circumstances where a union disciplines an individual member. It does *not* apply where, as is alleged here, one union in a contractual relationship with another union takes an action adverse to that other union, and that adverse action is alleged, in turn, to have caused derivative harm to the members of the latter union. A separate provision of federal law, which Plaintiffs do not invoke, is applicable to

17

remedy inter-union breaches of duty that are alleged to cause harm to the members of the adversely affected union.

V.     The District Court did not abuse its discretion in denying leave to amend. Given the fact that the Complaint here was 246 pages and that Plaintiffs had ample time and opportunity to bring any new matter to the Court and failed to do so, the Court was within its discretion in denying leave.

## ARGUMENT

"To prevail on a civil RICO claim, a plaintiff must prove that the defendant engaged in (1) conduct (2) [connected to] an enterprise (3) through a pattern (4) of racketeering activity and, additionally, must establish that (5) the defendant caused injury to plaintiff's business or property" through the underlying RICO violation. *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1086 (9th Cir. 2002).

"Racketeering activity"—commonly referred to as a RICO "predicate act"—is defined by statute as an act which is indictable under a specified list of criminal laws. *See* 18 U.S.C. §1961(1). Among those predicate acts is attempted extortion indictable under the federal Hobbs Act or "chargeable under State law." 18 U.S.C. §1961(1)(A-B). Attempted extortion is the only predicate act on the RICO list that is relevant here.[3]

---

[3] "Extortion" in its completed form, as well as "attempted extortion," constitutes a RICO predicate act, but the completed crime of extortion is not at issue here because the Complaint, in alleging that Plaintiffs have not acceded to any of

In Part I below, we show that the District Court correctly held that the Complaint fails to allege the RICO predicate act of attempted extortion and thus fails at its inception to make out the basic "racketeering activity" element of a RICO claim. In Part II, we show that the RICO claims also are subject to dismissal because they fail to satisfy the distinct "pattern" element. In Part III, we show that the first two RICO counts are subject to dismissal for reasons specific to those counts. And in Part IV, we show that the LMRDA claim fails as well.

## I.    THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' RICO CLAIMS FOR FAILURE TO MAKE OUT THE BASIC "RACKETEERING" ELEMENT

### A.    As the District Court Held, the Complaint Fails To Make Out the Elements of Hobbs Act "Attempted Extortion"

The federal Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by the wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. §1951(b)(2).

It is common ground that the test for determining whether the "wrongful use" element of a Hobbs Act violation has been pleaded or proved differs depending on whether the alleged violation is claimed to involve the use of force or violence as the defendant's means of inducing another's consent, or instead is claimed to involve the use of fear of economic loss as the means of so doing.

---

Defendants' alleged demands, *see* ER 271, forecloses any claim of completed extortion.

19

The parties agree that, where the defendant is alleged to have engaged in the use of force or violence to induce the plaintiff to enter into a proposed transaction, the nature of the proposed transaction is generally irrelevant because the use of force or violence is "inherently wrongful." *See, e.g., United States v. Daane*, 475 F.3d 1114, 1120 (9th Cir. 2007) (quotations omitted).[4]

Where, in contrast, the defendant is alleged to have engaged in the use of fear of economic loss, and *not* the use of force or violence, to induce the plaintiff to enter into a proposed transaction with the defendant, the parties agree that the nature of the proposed transaction becomes a crucial issue. We, like the Plaintiffs, therefore analyze separately—and first—the facet of the Push-Back-Carpenters Campaign that is alleged to involve the use of economic fear to pressure the UBC into rejoining the BCTD.

    **1.**    **The Complaint Fails To Make Out a Hobbs Act Violation Based on the "Wrongful" Use of Economic Pressure**

        **a.**  **An Unbroken Line of Hobbs Act Appellate Decisions Establishes that Where a Defendant Uses Economic Pressure To Obtain a Lawful and Legitimate Agreement, that Use Is Not the "Wrongful Use of Fear"**

An unbroken line of appellate decisions relied upon by the District Court firmly establishes (i) that where, as here, a plaintiff's claim is that a defendant's

---

[4] We say "generally" irrelevant, because there is a recognized exception, not implicated by the Complaint's allegations or invoked by Defendants. *See United States v. Thordarson*, 646 F.2d 1323, 1326 (9th Cir. 1981).

use of fear of economic loss to pressure the plaintiff to enter into a transaction involving the transfer of property is a "wrongful use of fear" within the Hobbs Act's definition of "extortion," quoted *supra* at 19, the viability of that claim turns on the defendant's objective; and (ii) that if the defendant is using fear of economic loss to pressure the plaintiff to enter into a lawful and legitimate transaction, the use is *not* "wrongful" and the plaintiff's claim fails.

The two leading decisions in this line are the Second Circuit's decision in the criminal Hobbs Act case of *United States v. Clemente*, 640 F.2d 1069 (2d Cir. 1981), and the Third Circuit's decision in the civil RICO Hobbs Act case of *Brokerage Concepts v. U.S. Healthcare*, 140 F.3d 494, 523 (3d Cir. 1998).

In addressing the issue of what suffices to satisfy the "wrongful use" element of Hobbs Act extortion, the *Clemente* court began by making the crucial observation that it is improper to assess that element "in a vacuum, independent of" the means used by the defendant to obtain the alleged extortion victim's property. *Id.* at 1077. That is so, because "[i]t is obvious that the use of fear of financial injury"—in contrast to the use of actual or threatened force or violence— "is not inherently wrongful." *Id.*

Given these considerations, the *Clemente* court held that, in a case involving the allegation that the defendant "used fear of economic loss"—and not force or violence—to obtain property, the "wrongful use" element of Hobbs Act extortion

21

is satisfied only when such fear of economic loss is used "to achieve *a wrongful purpose*," and not when it is used "'to obtain *legitimate economic ends*.'" *Id.* (emphasis added).

Applying this test, the *Clemente* court upheld the defendant's Hobbs Act extortion conviction, finding sufficient evidence to support the jury's verdict that the defendant used fear of economic loss in furtherance of what the Supreme Court in *United States v. Enmons*, 410 U.S. 396 (1973), had cited as an example of a *wrongful demand* in a Hobbs Act extortion case: namely, a demand for "personal payoffs." *See* 640 F.2d at 1078; *Enmons*, 410 U.S. at 400. As the *Clemente* court noted, the Hobbs Act extortion convictions of the union officials in *Enmons* were overturned because those officials, unlike the defendants in *Clemente,* had made *a lawful and legitimate demand* in collective bargaining negotiations for "higher wages in return for genuine services which the employer [sought]." *See* 640 F.2d at 1076 n.6; *Enmons*, 410 U.S. at 400.

In *Brokerage Concepts*, the Third Circuit set aside a civil RICO jury verdict finding that the defendant healthcare conglomerate (U.S. Healthcare) had committed the RICO predicate act of Hobbs Act extortion by advising a pharmacy (Gary's), which belonged to U.S. Healthcare's preferred provider network, that U.S. Healthcare would terminate Gary's participation in that network unless Gary's agreed to switch its Third Party-Administrator (TPA) contract from the

22

plaintiff to one of U.S. Healthcare's subsidiaries. 140 F.3d at 501. In setting aside

that verdict, the court "adopt[ed]" the Second Circuit's holding in *Clemente* and

elaborated on that holding in terms that go to the heart of the matter here:

> Unlike the use or threatened use of force or violence, the use of economic fear in business negotiations between private parties is not "inherently" wrongful. Indeed, the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions. This economic reality leads us to conclude that the reach of the Hobbs Act is limited in cases, such as this one, which involve the use of economic fear in a transaction between two private parties. The limitation we apply is that set forth in *Enmons*: that a defendant is not guilty of extortion if he has a lawful claim to the property obtained.

140 F.3d at 523 (internal citations omitted).

The Third Circuit elaborated on the meaning of the term "lawful claim" in

this context by explaining that, in *Enmons,* the union officials who were

demanding an improved collective bargaining agreement "had a lawful claim to the

property" they were seeking because they were asking for "higher wages, in return

for genuine services," whereas in the cases that *Enmons* distinguished, the union

officials were seeking "personal payoffs" or other transactions *not* reflecting a

bona fide exchange of value. *Id.* at 524.

Applying its holding, the Third Circuit ruled that U.S. Healthcare *did* have

"a lawful claim to the property obtained" from Gary's (the TPA contract), because

"U.S. Healthcare could have denied Gary's access to its [preferred provider]

23

network for any reason, or for no reason at all," and "[u]nder these conditions, U.S. Healthcare had the right to exchange the valuable consideration of inclusion in its network in return for consideration from Gary's in the form of its TPA contract." *Id.* at 522, 526. The Third Circuit observed that the outcome might well have been different if Pennsylvania were a State with an "any willing provider law" requiring HMOs to accept all qualified customers into their networks, because in that circumstance U.S. Healthcare would not have been providing any new consideration to Gary's by "allowing" it into the network in exchange for Gary's agreement to sign a TPA contract with the U.S. Healthcare subsidiary. *Id.* at 527. Rather, Gary's would have had a "pre-existing right" to entry into that network and thus would have obtained nothing new. *Id.*

Under *Brokerage Concepts*, then, a defendant has a "lawful claim" to a proposed transaction for Hobbs Act purposes where that proposed transaction is legitimate and lawful—i.e., where the transaction, if consummated, would be enforceable and result in both parties to the transaction receiving genuine consideration.

The *Clemente/Brokerage Concepts* analysis has since been followed by the two courts of appeal to have considered the Hobbs Act "use of economic fear" issue. *See George Lussier Enters. v. Subaru of New England*, 393 F.3d 36 (1st Cir. 2004); *Rennell v. Rowe*, 635 F.3d 1008 (7th Cir. 2011).

24

### b. The Agreement Sought by the Defendants Here is Lawful and Legitimate

As the District Court held, an affiliation agreement between an individual labor union (like the UBC) and a federation of labor unions (like the BCTD) that charges a monthly affiliation fee in exchange for the services and benefits provided by the federation to its affiliated unions—like a collective bargaining agreement providing for "higher wages in return for genuine services," *Enmons*, 410 U.S. at 400—is "assuredly" a lawful and legitimate agreement. ER 25.

Indeed, in their Brief, Plaintiffs do not dispute the proposition that what Defendants allegedly are seeking to accomplish here through the "use of fear of economic loss"—the re-affiliation of the UBC with the BCTD—would be an entirely "lawful" and "legitimate" transaction if consummated. Nor could they dispute that proposition, given how widely accepted such affiliation agreements are within the American labor movement, including the sector of the labor movement in which the UBC itself operates, *see* ER 49 (noting that the UBC has "hundreds of affiliated Councils and local unions"); and given the allegations in Plaintiffs' own Complaint that the UBC and its affiliates and members have been wronged and injured by the Metal Trades Department's decision to terminate the parties' affiliation agreement, ER 174-75.

This conclusion is buttressed, we would add, by a particularly on-point district court decision, *Cintas v. Unite Here,* 601 F. Supp. 2d 571 (S.D.N.Y.), *aff'd*

25

355 F. App'x 508 (2d Cir. 2009). In *Cintas*, the plaintiff employer advanced a

RICO "attempted extortion" theory to challenge a multi-faceted union economic

pressure campaign that allegedly included the repeated dissemination of

"disparaging information" about the employer to induce it to enter into an

unwanted "card-check/neutrality agreement" with the defendant union. The *Cintas*

court, following the reasoning of the appellate cases outlined above, held that,

because the proposed card-check/neutrality agreement was lawful and legitimate,

the defendants' use of economic pressure to induce the plaintiffs to enter into a

such an agreement was *not* a "wrongful use" of fear of economic loss and thus *not*

"attempted extortion" under the Hobbs Act.

> **c. Plaintiffs' Efforts To Find Defendants' Use of Economic Pressure "Wrongful," Notwithstanding the Legitimacy of Plaintiffs' Objective, Are Unavailing**

In the face of this substantial body of Hobbs Act law, the UBC makes two

legal arguments in support of its contention that Defendants' economic pressure

campaign to induce it to rejoin the BCTD constitutes Hobbs Act "attempted

extortion." Neither is availing.

(i)  First, the UBC contends that where the transaction being proposed by the

defendant in a "use of economic fear" extortion case is a transaction that is

"unwanted" by the other party to the proposed transaction, the defendant's use of

economic fear necessarily becomes extortionate. AOB 23. But that contention flies

in the face of the appellate decisions just canvassed, as well as the particularly on-point decision (affirmed by the Second Circuit) in *Cintas*, all of which make clear that the use of economic pressure in support of a proposed transaction that the other party does not "want" is *not* extortionate under the Hobbs Act so long as the proposed transaction is lawful and legitimate.

Indeed, a common ingredient in every case in this line is that the party on the other side of the transaction from the defendant did *not* "want" to enter into that transaction and would not have considered doing so absent the economic pressure being exerted by the defendant. In *Brokerage Concepts*, for example, the Third Circuit held that it was lawful, not extortionate, for the defendant healthcare conglomerate to use the fear of economic loss to pressure a pharmacy to enter into a third-party administrator contract with one of the conglomerate's subsidiaries, even though the pharmacy did not want to enter into that transaction, or any transaction, with the subsidiary. 140 F.3d at 501.

Likewise, in *Cintas*, the court held that the defendant union did not commit Hobbs Act attempted extortion by threatening the plaintiff employer with economic loss to pressure it into signing a proposed card-check/neutrality agreement, even though the employer plainly did not want any such agreement. The lawfulness and legitimacy of such agreements, which, like affiliation agreements, involve the exchange of mutual obligations and benefits, sufficed to

27

render the union's use of economic fear permissible and not extortionate under the Hobbs Act. 601 F. Supp. 2d at 577.

Plainly, then, the fact that UBC does not "want" to reaffiliate with the BCTD and does not "value" the particular mix of benefits and obligations that come with membership in the BCTD is *not* a fact that takes this case outside of the holdings of the line of Hobbs Act decisions set out above.[5]

(ii)  Plaintiffs' second argument proceeds from the factual premise that the Complaint alleges that Defendants are responsible for engaging in "a host of wrongful pressure tactics short of violence" that constitute "tortious acts of harassment." AOB 1, 25-26. From that premise, Plaintiffs contend that they have made out a Hobbs Act violation because, according to the Plaintiffs' reading of the Hobbs Act precedents, "harassment short of violence … is 'wrongful' under the Hobbs Act," not only when "the defendant demands the victim's property in exchange for 'imposed, unwanted, superfluous and fictitious services,'" AOB 16,

---

[5] In a futile effort to show otherwise, Plaintiffs assert that two appellate decisions stand for the proposition that "using fear to demand payment for unwanted services is wrongful under the Hobbs Act even if there might be 'something of [objective] value' in those services," AOB 24, but both decisions are inapposite inasmuch as both involved a demand for a "personal payoff" involving no bona fide exchange of consideration. *See United States v. Vigil,* 523 F.3d 1258, 1265 (10th Cir. 2008) (elected official convicted of extortion where he insisted that government contractor pay 40% of gross income from contract to an acquaintance of the official "intended as a personal payoff"); *United States v. Greger,* 716 F.2d 1275 (9th Cir. 1983) (defendant convicted of extortion for insisting on a bribe in exchange for not terminating plaintiff's business contract with defendant's employer).

but also when "the victim had a statutory, common law, or contractual right to be free from the harassment." AOB 16. This argument misstates both the facts and the law.

Plaintiffs misstate the facts, because, as set out in detail in our Counterstatement of the Case, four of the five so-called "tortious acts of harassment" that Plaintiffs attribute to Defendants in their appellate brief either are not tortious at all or are not properly attributable to the Defendants given the allegations in the Complaint. *See supra* at 10-13. Thus, far from the Complaint pleading a "host" of tortious acts attributable to Defendants in connection with the Push-Back-Carpenters Campaign, there is, at most, a single isolated tortious act attributable to Defendants in the course of that five-year campaign. *See supra* at 13.

Plaintiffs misstate the law, because the cases on which Plaintiffs rely, including *Brokerage Concepts*, *George Lussier*, and *Viacom Int'l v. Icahn,* 747 F. Supp. 205 (S.D.N.Y. 1990), *aff'd,* 946 F.2d 998 (2d Cir. 1991), do *not* ask the question whether the alleged extortion victim who was under economic pressure to enter into a proposed transaction had a pre-existing right to be "free from *the harassment*." Instead, as we have shown, the cases focus on the terms of the proposed transaction and ask whether the alleged victim had a pre-existing right to the purported consideration being offered by the defendant as an inducement to

29

enter into the transaction. If the alleged victim already had a pre-existing right to the purported consideration, the cases reason, then there is no legitimacy to the proposed transaction. It is no different in substance from a "personal payoff" of the kind condemned in *Clemente*, and the victim has the right to be free *from being pressured into meeting the demand.* Conversely, if the alleged victim had *no* pre-existing right to the purported consideration, as in *Brokerage Concepts*, then the defendants' use of economic fear to induce the transaction is perfectly legitimate.

Indeed, any reading of *Brokerage Concepts* or the other decisions in that line of cases that would make a Hobbs Act "use of economic fear" case turn on whether the defendant, in the course of an otherwise entirely lawful economic pressure campaign, engaged in any conduct that could be characterized as a state-law tort, contract violation, or statutory violation, would be contrary to the central point of *Brokerage Concepts* itself, which is that "the reach of the Hobbs Act is *limited* in cases, such as this one, which involve the use of economic fear in a transaction between two private parties" and that "[t]he limitation we apply *is that set forth in Enmons.*" 140 F.3d at 523 (emphases added). Under the *Enmons* "limitation," as we already have shown, the test for whether a given "use" of economic pressure in a Hobbs Act case is a "wrongful use" turns on the *objective* of the defendant applying the pressure—that is, on the nature of the transaction that the defendant is seeking to induce. Yet Plaintiffs' legal theory would have the Hobbs Act apply

30

when a single tort or other state-law violation is committed in the course of an economic pressure campaign, even where the campaign's tactics are otherwise entirely lawful and even where the campaign's objective is to secure an indisputably lawful and legitimate agreement.

What is more, Plaintiffs' breathtakingly expansive legal theory would not only be unfaithful to these precedents, it would have the effect of federalizing disputes that traditionally have been governed by state common law, which would contravene the Supreme Court's admonition in *Cleveland v. United States*, 531 U.S. 12, 27 (2000), that "[a]bsent clear statement by Congress," federal statutes should not be read "to place under federal superintendence a vast array of conduct traditionally policed by the States." The Seventh Circuit in *Rennell, supra,* and the district court in *Cintas, supra*, acted consistently with that admonition when they rejected expansive readings of the Hobbs Act akin to the reading proffered here by the UBC. *See Rennell,* 635 F.3d at 1014 (holding that although defendant, in pressuring the plaintiff to walk away from a joint venture on highly unfavorable economic terms, may "have breached his duties under the contracts and acted in violation of the general duty of good faith and fair dealing, among other things[,] … those claims should be pursued through state-law theories of contract and, perhaps, tort—not civil RICO"); *Cintas*, 601 F. Supp. 2d at 978 ("[t]o the extent that any of Defendants' statements [made in the course of their economic pressure

31

campaign] are defamatory, then Cintas can pursue those clams under state tort laws").

### 2. The Complaint Fails To Make Out a Hobbs Act "Attempted Extortion" Violation Based on the Alleged "Use of Force or Violence"

As noted, Plaintiffs also attempt to make out a claim of Hobbs Act extortion on the theory that Defendants engaged in the "use of force [or] violence" to induce the UBC to rejoin the BCTD. In rejecting this theory, the District Court ruled that the Complaint fails adequately to allege that any Defendant personally committed any of the handful of acts of vandalism and threats of violence described in the Complaint, or that any Defendant committed any of these acts through an agent or co-conspirator. ER 30-34. Plaintiffs' various attacks on that ruling all fail.

### a. Plaintiffs' Claim that the Complaint Alleges that Defendants "Personally" Made Threats of Violence is a Spurious One, Resting on a Serious Mischaracterization of the Complaint and a Serious Misunderstanding of the First Amendment

Plaintiffs begin by re-asserting their contention to the District Court that Defendants "*personally* made some of the violent threats against the Carpenters." AOB 28 (emphasis added). Their principal point, repeated like a mantra in their Brief, is that the Complaint includes allegations that Defendants "publicly disseminated video footage of a violent attack on Carpenters' members, accompanied by a written warning that similar violence would ensue if the

32

Carpenters did not comply with the Defendants' demands." AOB 29. As set out above in the Counterstatement of the Facts, *supra* at 8-9, that rendition of the Complaint is a fiction; the Complaint contains no such allegations.

Equally unfounded is Plaintiffs' assertion in their Brief that the Defendants personally "posted, or caused the posting of, videos and text on Building Trades' websites that direct and encourage violence against the Carpenters." AOB 29. The Complaint merely refers, without any detail, to "videotaped interviews of the BCTD Defendants and a number of their co-conspirators," ER 73, but never quotes or paraphrases any statements by the interviewees that amount to the "direct[ion]" or "encourage[ment]" of violence.

In their effort to portray Defendants as personally having made threats of violence, Plaintiffs also argue in their Brief that Defendants "delivered speeches containing anti-Carpenters *threats and incitements* to Building Trades' members and local leaders to take violent actions against Carpenters." AOB 29 (emphasis added). But the speeches they refer to do not by any stretch constitute threats of violence or incitements to violence.

For example, Plaintiffs allege that Defendant Williams personally conveyed threats of violence to the Carpenters because in June 2010, speaking at the "Unity Rally" described *supra* at 4-5, he said that the rally marked a "line in the sand" in the BCTD's dispute with the UBC, and that, after the rally, there would be "no

33

going back." ER 141. Those statements do not remotely qualify as threats of violence or incitements to violence. Indeed, to contend that statements of that nature constitute unlawful threats or incitement is not only contrary to reason, it is contrary to the First Amendment, which protects rhetoric that is far more combative than that attributed to Williams in the Complaint.

*NAACP v. Claiborne Hardware*, *supra,* illustrates the point. There the Supreme Court held that "the emotionally charged rhetoric" used in a public speech by Charles Evers, leader of a civil rights boycott, "did not transcend the bounds of protected speech" even though, in the course of making "an impassioned plea for black citizens to unify, to support and respect each other, and to realize the political and economic power available to them," he said to an assembled crowd that "any 'uncle toms' who broke the boycott would 'have their necks broken' by their own people." 458 U.S. at 900 n.28, 928. The Court reasoned that, because the incidents of violence that the plaintiffs there attempted to impute to Evers had occurred "weeks or months after the … speech," the heated rhetoric, as a matter of law, did not cross the line from protected expression into unprotected incitement of imminent lawless conduct. *Id.* at 928.

Given that the "necks broken" statement was found protected in *Claiborne Hardware*, it follows that Williams' "line in the sand" and "no going back" statements necessarily are protected here. The same is true of the other instances of

34

fiery rhetoric at the rally that Plaintiffs claim constitute threats of violence, including non-Defendant O'Sullivan's asking the audience if they had any "rope." *See supra* at 7. As the District Court recognized, the Complaint contains no allegation that any incident of violence occurred swiftly—or, for that matter, even haltingly—on the heels of any of the alleged uses of fiery or combative rhetoric at the Unity Rally. ER 35-36. Indeed, the Complaint avers that it was not until 16 months after the Unity Rally that the first alleged incident of violence occurred—in October 2011. ER 211.

> **b.  The Complaint's Conclusory Conspiracy and Agency Allegations Are Insufficient Under Established Pleading Principles To Hold Defendants Responsible for the Violent Acts of Third Parties**

Plaintiffs' contention that the Complaint properly imputes violence by third parties to Defendants based on theories of conspiracy, agency and ratification, fares no better.

(i)  The District Court properly rejected Plaintiffs' "conspiracy" argument on the ground that the Complaint nowhere alleges "facts to establish any actual contact between the Defendants and the individuals accused of vandalism and threats of force, much less actual agreement" to commit acts or threats of violence or vandalism. ER 31.

On appeal, Plaintiffs nevertheless insist that five non-Defendants who allegedly threatened violence are properly alleged to have "specifically conspired"

with Defendants. AOB 31-32. The first of these non-Defendants is Terrence O'Sullivan, whose speech at the Unity Rally was, we have just shown, not an act of unlawful incitement to violence but rather protected First Amendment speech.

That leaves as the relevant alleged co-conspirators Stephen Schoemehl, his brother Tim, Doug Strand, and Erik Gustafson. And a review of the Complaint confirms the District Court's conclusion that the Complaint contains absolutely no allegation of any agreement between any Defendant and any of these non-Defendants to enter a conspiracy involving vandalism or violence. Indeed, the Complaint does not allege that any Defendant even *knows* these individuals, much less that Defendants entered into any *agreement* to conspire with one or more of them.

As to Strand and Gustafson, the Complaint alleges in conclusory terms that Strand and Gustafson each "agreed to act, and was acting, on behalf of the Defendants." ER 106, 109. But that type of boilerplate allegation—which does not even identify the person or entity with whom Strand and Gustafson "agreed" to act—is woefully insufficient to qualify as a statement of fact rather than a conclusion of law under the now-familiar pleading standards established in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

36

As this Court has explained, to properly plead that a defendant conspired with another person, it is insufficient merely to allege "legal conclusions" or "ultimate facts, such as conspiracy" or "coconspirators"; rather, the plaintiff must "plead the necessary evidentiary facts to support those conclusions." *Kendall v. Visa USA,* 518 F.3d 1042, 1048, 1050 (9th Cir. 2008). Specifically, the complaint must, at the very least, "answer the basic questions: who, did what, to whom (or with whom), where, and when?" *Id.* at 1048. Thus, simply asserting that there was some "agreement" does not suffice, *id.* 1047; nor does identifying one wrongdoer and saying that another was a "coconspirator[]," *id.* at 1050. Yet that is all that Plaintiffs have done here; there are no evidentiary facts at all to back up their boilerplate assertions of conspiracy.

(ii)  Plaintiffs next seek to tie the alleged acts of vandalism and violence to Defendants through what they call an "agency" theory. AOB 34-35. But their "agency" argument is not really an agency argument at all; it is simply a re-hash of their argument that the allegations in the Complaint are sufficient to make out a claim that Defendants *personally directed* the alleged violence. Thus, Plaintiffs argue that the Complaint alleges that Defendants themselves personally "*urged* all members and officials of subordinate Building Trades unions nationwide to take legal *and illegal* actions against the Carpenters on behalf of the Campaign and its leaders," and that the "ranks committed the violent acts *at the direction of the*

*Building Trades and its leadership*." *Id.* (emphasis added). But, as we already have shown, there is no substance whatsoever to this thinly disguised personal-responsibility-for-the-alleged-violence argument.

We would stress that, where the Complaint even names the perpetrator of an alleged act of violence, the Complaint identifies the perpetrator as an employee of an organization *separate from the BCTD*—either a BCTD affiliate or, even further removed, an affiliate of an affiliate—and specifies no relationship between that individual and the BCTD or the other Defendants, let alone a relationship involving the critical element of "control" necessary to establish agency. *See* Restatement (Third) of Agency, §101.1 cmt. c ("[a] relationship is not one of agency within the common-law definition unless … the principal has the right throughout the duration of the relationship to control the agent's acts"). That is fatal, because the law is well established that parent labor organizations and labor federations are separate entities from their affiliates and are not vicariously liable on an "agency" theory for the actions of their affiliates or their affiliates' employees and members. *See generally Laughon v. Int'l Alliance of Theatrical Stage Employees,* 248 F.3d 931, 935 (9th Cir. 2001). Likewise, labor organizations cooperating with one another on a joint campaign are not, by virtue of their cooperation, "agents" of one another. *See BE&K Const. v. United Bhd. of Carpenters*, 90 F.3d 1318, 1326 (8th Cir. 1998).

38

As the District Court correctly held, Plaintiffs cannot plead around these principles by conclusory formulaic incantations of the phrase "Defendants' agents" to describe the alleged perpetrators of violence or vandalism. ER 33.

(iii)  Nor is there any merit in Plaintiffs' last-ditch argument that the acts of vandalism and violence alleged in the Complaint are attributable to Defendants under the "agency doctrine of ratification." AOB 35.

Ratification requires, at a minimum, *both* (1) that the third party was an agent, or held himself out as an agent of, the defendant, *see Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003) ("[a]lthough a principal is liable when it ratifies an originally unauthorized tort, the principal-agent relationship is still a requisite, and ratification can have no meaning without it"); *and* (2) that the defendant had "knowledge of the facts relating to the unauthorized act of the [third party] who assumed to act as agent," *NLRB v. Lloyd A. Fry Roofing Co.*, 193 F.2d 324, 326 (9th Cir. 1951).

The Complaint does not adequately allege either of these basic requisites of the "agency doctrine of ratification." Rather, the Complaint contains only the conclusory, omnibus allegation that "Defendants themselves, or by and through their agents" "approv[ed] and/or ratif[ied]" all the acts described in the Complaint, ER 207, which is manifestly insufficient under the *Twombly-Iqbal* pleading standard.

39

Against this, Plaintiffs cite cases that serve only to illustrate how far short they fall in pressing their ratification theory. In *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132 (D.C. Cir. 1989), the perpetrator of an act of picket-line vandalism for which defendant Local 639 was held liable was *a full-time officer of Local 639*, described by the court as "Local 639 *business director* Woodward." *Id.* at 134-35 (emphasis added), and he was the union's designated "man in charge" of the picket line. *Id.* at 136. In addition, Local 639's President was notified of Woodward's acts of vandalism and thereafter left Woodward in charge of the picket line. *Id. That* response to *known* incidents of violence committed by an *officer* of the defendant local union is worlds removed from what is alleged here: that the Defendants did not respond to acts that they did not know about, committed by persons employed by different labor organizations.

Likewise, in *Seattle Times v. Seattle Mailer's Union No. 32*, 664 F.2d 1366, 1369 (9th Cir. 1982), defendant Local 32 was held responsible, *not* for an act committed by an employee or member of another union, but for an orchestrated work slow-down that occurred after one of Local 32's shop stewards told a company representative that there would be "trouble" if the company did not rescind a decision to end a production shift and after Local 32, having been made aware of the slowdown, not only refused to take action to end it, but actually

40

signaled its approval of the slowdown. That case, too, provides Plaintiffs no

support at all.[6]

### c. The District Court's Alternative Ground for Rejecting the Plaintiffs' Extortion-Through-Force Theory—that None of the Alleged Violent Acts Caused a Cognizable RICO Injury—Also Provides a Sound Basis on Which to Reject that Theory

The District Court rejected Plaintiffs' extortion-through-force theory, not

only because the Complaint failed properly to allege that the Defendants personally

committed or were responsible for the alleged acts of vandalism and violence, but

also because none of those acts are alleged to have proximately caused any of

Plaintiffs' alleged RICO injuries to their "business or property" as required under

RICO's private civil action provision, 18 U.S.C. §1964(c). ER 8-10.

In appealing from this determination, Plaintiffs begin by misinterpreting the

District Court's opinion, treating it as if it included only a general determination

---

[6]   In a footnote, Plaintiffs assert, without argument, that the "heightened proof standard" required by Section 6 of the Norris-LaGuardia Act, 29 U.S.C. §106 ("NLGA"), for imputing wrongful conduct to a defendant in a case arising out of a labor dispute "does not apply here." AOB 36 n.6. Because Plaintiffs have so plainly failed to satisfy the ordinary common-law standard, this Court, like the District Court, need not reach this question. *See* ER 35. But we would note that §6, by its terms, applies to all actions, including federal statutory actions like this one, that seek to hold unions or their officers responsible for federal statutory wrongs committed by others. Thus, in *United Brotherhood of Carpenters v. United States*, 330 U.S. 395, 403 (1947), the Supreme Court applied §6 to a prosecution under the Sherman Act, and in *United States v. Kemble*, 189 F.2d 889, 892 (3d Cir. 1952), the Third Circuit applied §6 to a Hobbs Act prosecution. There is nothing in RICO to warrant the conclusion that it stands on a different footing than the antitrust laws or the Hobbs Act with respect to the applicability of §6.

that there were no allegations of a RICO injury in the Complaint from *any* cause and lacked any more focused determinations. AOB 44. In fact, in one portion of its opinion, ER 8-10, the court zeroed in on the Complaint's allegation that "property was damaged through the alleged acts of vandalism" and found that allegation to be insufficient, because the Complaint failed to allege that any of the vandalized property "belonged to the UBC or to any named Plaintiff." ER 9-10. That finding of a lack of injury to "[*Plaintiffs'*] business or property" by reason of the alleged violence is unimpeachable, and Plaintiffs do not even attempt to rebut it.[7]

### C.   The District Court Correctly Rejected Plaintiffs' Attempt to Ground Its RICO Claims on State Extortion Statutes

The court below ruled that because Defendants' alleged conduct does not meet the "wrongful use" element of Hobbs Act extortion, that alleged conduct cannot be the basis for *either* a RICO predicate offense of Hobbs Act extortion *or* the separate RICO predicate offense of extortion "which is chargeable under State law." See ER 13-14, 16-19. Plaintiffs' challenge to this ruling is baseless.

As the court below accurately observed, the Supreme Court "has spoken very clearly on" the legal point at hand. ER 17. In *Scheidler v. NOW*, 537 U.S. 393

---

[7]  Instead, Plaintiffs try to change the subject, asserting that "Defendants' motion to dismiss did not argue" this deficiency. AOB 44. But Defendants' motion did argue this point—*under its own heading*. *See* Dist. Ct. Dkt. No. 58 at 24 ("ii. Because plaintiffs allege no 'injury to [their] business or property' caused by any of the alleged violent acts, those acts are insufficient to form the basis of a RICO predicate offense").

(2003), and then again four years later in *Wilkie v. Robbins*, 551 U.S. 537 (2007), the Supreme Court stated in the clearest possible terms that "even assuming that [a] defendant['s] [alleged] conduct would be 'chargeable under State law,' 18 U.S.C. §1961 (1)(A), it *cannot* qualify as a predicate offense for a RICO suit *unless it is capable of being generically classified as extortionate*.'" *Wilkie*, 551 U.S. at 567 (quoting *Scheidler*, 537 U.S. at 409 (emphasis added)). And, in *Scheidler*, the Supreme Court made it equally clear that "generic extortion" has *the exact same required elements* as Hobbs Act extortion—including, of direct relevance here, the "wrongful use" element. *Scheidler*, 537 U.S. at 409 (defining "generic extortion" as "obtaining something of value from another with his consent induced by the *wrongful use* of force, fear or threats") (emphasis added).[8]

---

[8] Plaintiffs assert that both *United States v. Nardello*, 393 U.S. 286 (1969) and *United States v. Velasquez-Bosque*, 601 F.3d 944 (9th Cir. 2010) recognize a "contrast" between the Hobbs Act definition of extortion and the generic definition of extortion that calls for a different construction and application of the two definitions. AOB 41. But in fact the precise opposite is true: Both decisions recognize that the two definitions of extortion are identical in all material respects and thus are to be construed and applied in the same manner.

In *Nardello*, the Supreme Court noted the Hobbs Act definition of extortion, *see* 293 U.S. at 289 n.3, and then proceeded to state a generic definition of extortion for federal Travel Act purposes that tracks the Hobbs Act definition in all essential respects, s*ee id.* at 290. Plaintiffs' intimations to the contrary notwithstanding, the "*cf.*" notation immediately preceding the *Nardello* Court's recitation of the Hobbs Act definition does not suggest that there is in the Court's view a "contrast" between the two definitions, but rather makes the different point that the Travel Act, unlike the Hobbs Act, does not contain an explicit definition of extortion, thereby necessitating the use of the generic definition of extortion for Travel Act purposes to fill that statutory gap.

Applying these clearly-stated legal principles, the Supreme Court squarely held in both *Scheidler* and *Wilkie* that the RICO plaintiff's failure adequately to allege that the defendant's conduct met each of the required elements of the RICO predicate offense of Hobbs Act extortion was fatal to the plaintiff's claim that the defendant's conduct amounted to the separate RICO predicate offense of extortion "chargeable under State law." *Scheidler*, 537 U.S. at 409-10; *Wilkie*, 551 U.S. at 563. So too here, under this directly-on-point Supreme Court authority, Plaintiffs' failure adequately to allege that Defendants' conduct meets the "wrongful use" element of the RICO predicate offense of Hobbs Act extortion is fatal to Plaintiffs' claim that Defendants' conduct amounts to the separate RICO predicate offense of extortion "chargeable under State law." *Accord Cintas,* 601 F. Supp. 2d at 578.

Plaintiffs' rejoinder to the District Court's ruling on this point—*viz.*, that to read *Scheidler* and *Wilkie* as dictating this result would "destroy the explicit conjunctive choice that Congress provided to plaintiffs under RICO," *see* AOB 39-40 (quoting *Smithfield Foods, Inc. v. UFCW*, 585 F. Supp. 2d 789, 802 (E.D. Va. 2008)—rests on a false premise. As the *Wilkie* Court noted, the Hobbs Act contains

---

In *Velasquez-Bosque*, this Court cited *Scheidler* and two of its earlier decisions in recognizing the parallelism between the generic definition of extortion and the Hobbs Act definition, *see* 601 F.3d at 959, and then proceeded to construe and apply the generic definition of extortion in a manner that "comports with" the case law construction and application of the Hobbs Act definition, *see id.* at 961. The subsequent passage in *Velasquez-Bosque* relied on by Plaintiffs, *see* AOB 42 (citing 601 F.3d at 963), is inapposite, inasmuch as in that passage this Court was dealing with generic robbery and *not* generic extortion.

a separate "interference with interstate commerce" requirement that obviously is not replicated in individual state extortion statutes. *See* 551 U.S. at 563. Thus, where acts of generic extortion have been committed but without an effect on interstate commerce sufficient to enable invocation of the Hobbs Act as a RICO predicate offense, a RICO plaintiff would have the "choice" of invoking the applicable state extortion statute instead.

## II. THE COMPLAINT ALSO FAILS TO MAKE OUT THE SEPARATE "PATTERN" ELEMENT OF A RICO CLAIM

Although, as we have shown, the RICO claims all fail on the ground that no predicate acts of racketeering have adequately been alleged, we would be remiss if we did not add that the Complaint also suffers from an independent legal deficiency that warrants dismissal of those RICO claims: namely, that the Complaint does not adequately allege the commission by Defendants of the requisite *pattern* of such acts. *See supra* at 18 (noting this additional required element of a RICO claim).

Plaintiffs seek to sweep this independent legal deficiency under the rug in a footnote, AOB 50 n.11, blithely asserting that the RICO pattern element "is not an issue on this appeal" and that, in any event, the Complaint's allegations "undoubtedly" satisfy the RICO pattern element. Each of these assertions is wrong.

The assertion that the RICO pattern element "is not an issue on this appeal" is wrong because it disregards the principle that an appellate court may affirm a Rule

12(b)(6) dismissal on any ground appearing of record—including, as here, a legal ground presented by the defendant but not addressed by the court below. *See Steckman v. Hart Brewing, Inc.,* 143 F.3d 1293, 1295 (9th Cir. 1998).

The assertion that the Complaint's allegations "undoubtedly" satisfy the pattern element is likewise wrong, because, as we now show, those allegations fail even to meet the most basic requirement of a "pattern," *viz.*, that there be "at least two acts of racketeering activity," 18 U. S. C. § 1961(5). *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 232 (1989).[9]

Plaintiffs' argument that the Complaint satisfies the two-or-more-predicate-acts prong of the pattern element rests on the legal theory that each one of the numerous acts allegedly undertaken by Defendants "in furtherance of" their campaign to pressure the UBC into rejoining the BCTD is a "separately chargeable" act of attempted extortion. That legal theory has no proper basis in the law of extortion, as shown by the directly-on-point decision in *Dtex, LLC v. BBVA Bancomer*, 405 F. Supp. 2d 639 (D.S.C. 2005), *aff'd*, 214 F. App'x 286 (4th Cir. 2007), dismissing a RICO claim that precisely parallels the RICO claims here for failure, *inter alia*, to satisfy the two-or-more-predicate-acts prong of the pattern element.

---

[9] Plaintiffs' allegations also fail to satisfy the separate "continuity" prong of the "pattern" requirement, *see H.J., Inc.*, 492 U.S. at 237-40, but given the abundance of grounds for affirmance here, we will not burden the Court with briefing on that issue.

"The gravamen" of the plaintiff's failed claim in *Dtex* was that the defendant had engaged in numerous acts constituting the "wrongful use of force, violence and [economic] fear" as part of a "wide-ranging" course of conduct in furtherance of a single objective:  to "extort money from [p]laintiff in exchange for allowing [p]laintiff to conduct its business in Mexico." 405 F. Supp. 2d at 642-43, 649. In an an effort to satisfy the "two or more predicate acts" prong of the RICO pattern element, the *Dtex* plaintiff sought to characterize each one of the defendant's numerous acts in furtherance of its single extortionate objective as a separately chargeable RICO predicate act of attempted extortion. *See id.* at 649.

The *Dtex* court held that the complaint was legally deficient in this respect and thus due to be dismissed because, *in substance*, the complaint "alleges at best *one* attempted predicate act [of extortion]," and "[p]laintiff's claims that Defendant engaged in multiple acts of extortion and attempted extortion are *improper attempts* to separate multiple acts in furtherance of *the same alleged [extortionate objective]* into multiple predicate acts." *Id.* (emphasis added).

The *Dtex* court rightly found support for its holding on this point in several RICO decisions, including then-District Judge Lynch's decision in *Linens of Europe, Inc. v. Best Manufacturing, Inc.*, 2004 WL 2071689 (S.D.N.Y. Sept. 16, 2004), holding that allegations that the defendant "repeatedly threatened [the plaintiff] … with harm" to induce the plaintiff "to part with its property" identified

47

"multiple acts" of improper conduct but "only a single predicate act of attempted extortion, not a pattern of two or more predicate acts." *Id.* at *16 (internal quotations omitted).

Plaintiffs' legal theory here precisely parallels the legal theory rejected in *Dtex* and *Linens of Europe* and is infirm for the reasons stated in those decisions.[10]

## III.   RICO COUNTS I AND II ARE DEFECTIVE FOR FAILURE TO PLEAD THE REQUISITE "INVESTMENT" AND "ACQUISITION" ELEMENTS

While *all* of the RICO counts should be dismissed for the reasons stated in Parts I and II *supra*, two of the RICO counts (I and II)—which allege a conspiracy under 18 U.S.C. §1962(d) of RICO to violate §§1962(a) and (b), respectively— have yet another defect, which the District Court correctly recognized in dismissing them on the alternative ground of failure to plead the requisite investment and acquisition elements applicable to those counts.

Subsection (a) of §1962 makes it an offense for "any person who has received any income" derived from a pattern of racketeering "to *use or invest*" such income in an enterprise, and subsection (b) makes it an offense for "any

---

[10] Contrary to Plaintiffs' assertion below, *United States v. Brooklier*, 685 F.2d 1208 (9th Cir. 1982), is not in conflict with *Dtex* and *Linens of Europe*. In *Brooklier*, this Court upheld the defendants' conviction on three counts of extortion because those defendants had extorted "*three separate payments*" from their victims, and thus had committed three separate *completed* acts of extortion. *See* 685 F.2d at 1217 (emphasis added). In contrast, the plaintiffs in *Dtex* and *Linens of Europe*, like Plaintiffs here, alleged that the defendants' numerous actions were all aimed at accomplishing a single extortionate objective.

person," through a pattern of racketeering activity, "to *acquire or maintain*" control of an enterprise or of an interest therein. (Emphases added).

As noted, RICO's civil action provision, 18 U.S.C. §1964(c), requires every private RICO plaintiff to plead and prove that he was "injured in his business or property by reason of a violation of section 1962." And, in *Wagh v. Metris Direct, Inc.*, 363 F.3d 821, 828 (9th Cir. 2003), *overruled on separate issue, Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007) (en banc), this Court ruled that where the alleged "violation of section 1962" at issue in a §1964(c) suit is a violation of *subsection (a)* of §1962, the plaintiff must, to survive a motion to dismiss, plead facts showing that he suffered a very specific type of injury—an "investment injury," which is an injury caused by the "use or investment" of income derived from a pattern of racketeering activity. By the same token, the *Wagh* court reasoned, where the alleged violation is a violation of *subsection (b)*, the plaintiff must plead facts showing an *acquisition injury*, that is, "an injury to plaintiff resulting from defendant's control or acquisition of a RICO enterprise." *Id.* at 830.

Finally—and of particular importance here—the *Wagh* Court squarely held that, where a RICO plaintiff cannot show that *anyone* has injured him by reason of a violation of subsection (a) or (b), the plaintiff cannot plead around that difficulty

49

by invoking subsection (d) of §1962 to plead a "conspiracy" to violate subsection (a) or (b). *See id.* at 831.

Plaintiffs concede, as they must, that the Complaint does not allege that anyone, whether a defendant or alleged "co-conspirator," has committed a *completed* violation of §1962(a) or (b), let alone that any Plaintiff has suffered an "investment injury" or "acquisition injury" by reason of such a violation. AOB 48. Plaintiffs nevertheless argue, directly contrary to *Wagh*—which they do not even cite—that they have pleaded around that difficulty by "assert[ing] a *conspiracy* to violate §§1962(a) and (b)." AOB 48 (emphasis added). In support of this argument, Plaintiffs invoke *Salinas v. United States*, 522 U.S. 52 (1997), a criminal RICO case, which they cite for the proposition that §1962(d) "conspiracies … are an evil unto themselves." AOB 48. And the lesson that Plaintiffs ask the Court to draw from this observation is that, under *Salinas,* a *civil* plaintiff can invoke 18 U.S.C. §1964(c) to state a claim under §§1962(a) or (b) so long as at least one of the coconspirators eventually plans to violate one of these substantive provisions, even if no actual substantive violation has been committed by anyone at the time of suit and therefore no "injury" could possibly have flowed from such a violation.

Plaintiffs' position is contrary to the square holding in *Wagh* and should be rejected for that reason alone. But even apart from *Wagh*, Plaintiffs' position is defective because the Supreme Court did *not* address the scope of *civil* RICO

conspiracy in the case Plaintiffs invoke—*Salinas*—but did do so, and in a manner that dooms Plaintiffs' argument here, in its subsequent decision in *Beck v. Prupis*, 529 U.S. 494 (2000).

In *Beck*, the Court specifically faulted the plaintiff there for "look[ing] to criminal, rather than civil, common-law principles … to interpret §§1964(c) and 1962(d) in conjunction." *Id.* at 500 n.6. The Court held that Congress intended for the courts to look to common-law principles in determining the scope of a RICO civil cause of action and that "[t]he obvious source in the common law for the combined meaning of [§§1964(c) and (1962(d)] is the law of *civil* conspiracy." *Id.* (emphasis added).

The *Beck* Court went on to explain that, at common law, "a [civil] conspiracy claim was *not an independent cause of action*, but was only the mechanism for subjecting co-conspirators to liability when one of their member *committed* a tortious act." *Id.* at 503 (emphases added). From that premise, the Court disposed of the issue before it—whether the plaintiff there, who was injured by an overt act in furtherance of a conspiracy and not by an independent act of racketeering, could proceed with a civil action—by holding that the plaintiff's claim failed because, at common law, only a plaintiff injured by an independent wrong could prevail in a civil conspiracy case. *Id.* at 505.

51

It follows ineluctably from *Beck's* reasoning that, because the common-law doctrine of civil conspiracy that §1964(c) incorporates does nothing more than expand the universe of defendants that a plaintiff may sue for a substantive RICO violation, a civil RICO plaintiff cannot proceed against a defendant for conspiracy to commit a substantive violation of §§1962(a) or (b) unless *someone* actually committed such a violation.

Under *Beck*'s reasoning, then, no less than under *Wagh*'s square holding, Plaintiffs' failure to allege any substantive violation of §1962(a) or §1962(b) is fatal to their Count I and Count II conspiracy claims.

## IV.    THE COMPLAINT FAILS TO STATE AN LMRDA CLAIM

Plaintiffs' final federal claim (Count VIII) is being pressed on appeal only by the 19 individual UBC-member Plaintiffs. The claim was brought pursuant to LMRDA §101(a)(5), 29 U.S.C. §411(a)(5), which provides in full:

> No *member* of any labor organization may be fined, suspended, expelled or *otherwise disciplined*, except for nonpayment of dues, by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

(Emphases added).

Stripped to its essence, Plaintiffs' claim in Count VIII is that, as a precondition to its termination of its Solidarity Agreement with the UBC, the Metal

Trades Department was required by LMRDA §101(a)(5), to serve each and every rank-and-file UBC member that worked under the auspices of the Metal Trades with "specific written charges," afford each member a "full and fair hearing," and give that member a reasonable time to prepare a "defense." *See* ER 285-87.

The District Court was right to dismiss Count VIII, but it did so for the wrong reason—that the Metal Trades Department was a necessary party and was not named as a Defendant. Nevertheless, there is a proper ground appearing of record—and which Defendants pressed below—on which this Court can and should affirm.

That proper ground for affirmance is that the allegations in Count VIII make it clear that the action by the Metal Trades Department that is alleged to have harmed the UBC-member Plaintiffs—the termination of the Solidarity Agreement—was not taken against these Plaintiffs as individuals, as would be the case if, for example, they had been brought up on disciplinary charges for violating a union rule governing member conduct. Rather, the action was taken *against their union*, the UBC, and the harm that they complain of in Count VIII is only derivative of the alleged harm *to their union*. Thus, the Complaint alleges that the UBC-member Plaintiffs lost their rights and privileges in the Metal Trades only "*through the revocation of the Solidarity Agreement*" with the UBC, ER 287 (emphasis added), and not through any other action taken by the Metal Trades.

53

Where a union member's complaint is that he or she has lost a benefit or privilege, not as a result of being subjected as an individual to union discipline, but because another labor organization has terminated a contract with the union to which the member belongs, the logic of the federal labor law regime is that the member's recourse if the contract termination was wrongful is not through LMRDA §101(a)(5)'s protection against union "discipline" of an individual union member without due process; it is through a lawsuit against the other labor organization brought pursuant to a separate provision of federal labor law, §301 of the Labor-Management Relations Act, 29 U.S.C. §185, which expressly authorizes "[s]uits for violations of contract between … labor organizations." *See United Association v. Local 334*, 452 U.S. 615, 622-25 (1981); *United Bhd. of Carpenters, Local 42-L v. United Bhd. of Carpenters,* 73 F.3d 958, 961 (9th Cir. 1996). *Both* the unions that are parties to such inter-union contracts *and* the individual members who are third-party beneficiaries of such contracts may sue under §301. *Wooddell v. Elec. Workers*, 502 U.S. 93, 101 (1991).

While the provisions of LMRA §301 are ideally suited to the task of resolving disputes, such as the one here, over whether a union that is party to an affiliation agreement with another has violated that agreement in a way that has adversely affected the members of the other union, LMRDA §101(a)(5) is so ill-suited to that task as to render it inconceivable that Congress intended §101(a)(5)

54

to apply to such disputes. The "full and fair" hearing preceded by "written specific charges" issued to the "member" that is contemplated by LMRDA §101(a)(5) presupposes that a union has accused a member of violating a union rule or engaging in other misconduct and that the hearing will be about what *the member* did. That is why the provision accords the member "a reasonable time to prepare his *defense*." In short, it makes no sense to attribute to Congress an intent that LMRDA §101(a)(5)'s criminal procedure model, *see Breininger v. Sheet Metal Workers*, 493 U.S. 67, 91 (1989), should apply in circumstances where the issue is not whether any individual member did anything wrong, but whether one union affiliated with another union has breached the terms of its affiliation agreement with the other union in a manner adversely affecting the members of the allegedly wronged union.

Such a nonsensical and clearly unintended application of LMRDA §101(a)(5) is avoided if the provision is given the natural reading that Defendants urged below, under which the union member due process rights guaranteed by §101(a)(5) attach only where a union takes action directly against a member and *not* where, as here, a union takes action against an affiliated union whose members

55

claim to have been derivatively harmed by that action. On that reading, which this Court should adopt, Plaintiffs' Count VIII claims were properly dismissed.[11]

## V.     THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING LEAVE TO AMEND

Although Plaintiffs did not move for leave to amend in the court below, the District Court took up that issue *sua sponte* in its decision dismissing the Complaint, and denied leave to amend on the following "futility" ground:

> Clearly, Plaintiffs put forth their best effort at articulating their case. They have painstakingly detailed all of the facts alleged to be relevant to Plaintiffs' claims in a sprawling 246 page Complaint. The Court cannot conceive of any new facts that could possibly cure the pleading.

ER 46-47.

Plaintiffs acknowledge, as they must, that the District Court's denial of leave to amend is subject to review under an abuse of discretion standard, but argue that the District Court abused its discretion "by presuming that Plaintiffs could not plead facts to address any of the pleading deficiencies (if they existed) that the district court perceived." AOB 55. This argument is baseless.

---

[11] We note for the record that none of the 19 individual Plaintiffs are even members of the Metal Trades or its Councils, inasmuch as the Metal Trades and their Councils are federations whose only "members" are other unions. But since the Complaint pleads that the 19 are members of both the UBC and the Metal Trades, ER 85-90, 238, we have assumed that premise *arguendo*.

It is eminently reasonable, and most certainly *not* an abuse of discretion, for a district court to presume that plaintiffs who have "painstakingly detailed" the facts purportedly supporting their claims "in a sprawling 246 page Complaint" have "put forth their best effort at articulating their case" and not held back any "new facts" that could conceivably salvage their case. Indeed, the reasonableness of that presumption by the court below is underscored by the fact that in addition to filing "a sprawling 246 page Complaint," Plaintiffs supplemented their Complaint with seven exhibits totaling an additional 41 pages, as well as a 73-page RICO Case Statement. Dist. Ct. Dkt. No. 4.

Nevertheless, Plaintiffs claim for the first time on appeal to have certain undisclosed "documents and witness statements" that purportedly implicate Defendant Williams in certain unspecified threats of violence against the UBC. AOB 55. But Plaintiffs did not apprise the District Court of the explosive facts purportedly set out in those "documents and witness statements" during the long period between the filing of Defendants' 12(b)(6) motion in May 2012 and the oral argument on the motion in October 2012; during the oral argument itself; or during the period between the argument and the decision in December 2012. Plaintiffs' failure to do so further undermines their claim that the District Court abused its discretion in finding it inconceivable that Plaintiffs could cure their defective pleading through the allegation of "new facts."

## **CONCLUSION**

The District Court's judgment should be affirmed.

Respectfully submitted,

/s/ Leon Dayan
LEON DAYAN
ABIGAIL V. CARTER
JOSHUA B. SHIFFRIN
MATTHEW STARK RUBIN
LAURENCE GOLD
BREDHOFF & KAISER, PLLC
805 Fifteenth St. N.W., Tenth Floor
Washington, D.C. 20005
Telephone: (202) 842-2600

May 31, 2013

## STATEMENT OF RELATED CASES

Defendants-Appellees are not aware of any related cases other than the case identified in Appellants' Opening Brief.

s/ Leon Dayan
Leon Dayan

**Form 6.     Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   ☒ this brief contains <u>13,954          </u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   ☐ this brief uses a monospaced typeface and contains_____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this brief has been prepared in a proportionally spaced typeface using *(state name and version of word processing program)* <u>Microsoft Word 2003</u> *(state font size and name of type style)* <u>14 point, Times New Roman font</u> *, or*

   ☐ this brief has been prepared in a monospaced spaced typeface using *(state name and version of word processing program)* _____ with *(state number of characters per inch and name of type style)*

   _____ .

Signature  | s/Leon Dayan |

Attorney for | Defendants-Appellees |

Date | May 31, 2013 |

| 9th Circuit Case Number(s) | 12-36049 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | May 31, 2013 | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/Leon Dayan |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) | |